The plaintiff, Horace B. Wells, Jr., a carpenter, was employed by the firm of Morgan Lindsey, Inc. to make certain repairs or alterations on its store building located at 524 E. Main St. in Houma, Louisiana, and while performing his work, *Page 283 
the ceiling of the second story of said building collapsed and plaintiff was crushed by the second story floor and goods stored therein resulting in severe personal injuries for which he sues herein. It is alleged and shown that the building belonged to Miss Alice Blahut and was under lease to Morgan 
Lindsey, Inc. The building is a two-story building approximately 40 feet wide and 90 feet deep. The store occupied the whole of the lower floor and the rear 30 feet of the second floor. The rear 30 feet of the second floor was used by Morgan Lindsey as a storeroom for storing excess stock.
It appears that in July of 1946 it was discovered that the floor of this storeroom vibrated, and for that reason the store manager, Mr. G. H. Bedgood, was instructed by an official of the company to have the supporting columns of this stockroom replaced and, finally, plaintiff, Wells, was employed to do this job. On August 6, 1946 while performing his duties in replacing the two columns, which were felt to be insufficient to hold up the ceiling of the stockroom, the ceiling collapsed and, together with the merchandise stored in the stockroom, fell upon the plaintiff.
He alleges that the accident was caused by vices or defects in the building and that, in effect, by being employed to replace two posts in said building, a large part of it, including the part he was to work in, had been burned from a fire previous to the repair work, had caused the vices or defects alleged, he walked into a trap. Plaintiff further alleges that the defendant Morgan Lindsey, against his protest, continued to load goods and merchandise in the storeroom during the time that he was performing his work as carpenter.
On these alleged facts, he contends that the accident was caused solely by the gross negligence of Miss Alice Blahut, owner of the building, because of the vices and defects in the building, well known to her and not plaintiff, and also by the gross negligence of the defendant Morgan Lindsey, Inc., in storing goods and merchandise, in spite of his protest, in the storeroom and thereby adding additional weight on the weak columns which he was attempting to replace. He therefore claims damages in tort against Miss Blahut, Morgan Lindsey, Inc. and against Liberty Mutual Insurance Company of Boston as insurer of Morgan Lindsey.
In the alternative, plaintiff alleges that he was an employee of Morgan Lindsey; that carpentry is a hazardous occupation; and that in so far as the operations of plaintiff are concerned, Morgan Lindsey were engaged in an occupation properly classified as hazardous under the compensation act. Act No. 20 of 1914, as amended.
The defendants admit the allegation that the building was owned by Miss Alice Blahut and leased by Morgan Lindsey, Inc. They further admit that on August 6, 1946, plaintiff did sustain the accident alleged, resulting in serious personal injuries. Defendant Blahut denies that there were any vices or defects in the construction of the building and denies any liability to the plaintiff. The defendant, Morgan Lindsey, Inc., denies the material allegations of plaintiff's petition and avers that plaintiff was an independent contractor employed to perform the job of replacing two wooden supporting columns with two steel posts; that he was employed as an expert carpenter for that purpose after he had full opportunity to inspect the premises and to ascertain what the job was; that he had complete control and supervision of the work to be done at a stated compensation and that consequently he was an independent contractor. The defendant, Morgan Lindsey, Inc., and its insurer, further aver that they were guilty of no negligence whatsoever contributing to his accident, and in the event that any vice or defect existed in the building they deny responsibility therefor, since the building was merely leased and they had no knowledge or information of any defect or vice. In the alternative, in answer to the tort claim, these defendants allege that even if negligence should be found on their part, which is denied, then, in that event, it must be found that the plaintiff was guilty of contributory negligence. Their contention of contributory negligence is based on the allegation *Page 284 
that plaintiff, who is supposed to be an expert carpenter, through negligence or lack of skill, failed to support the beam or joist on the ceiling while removing one of the old wooden columns, with a house jack or by other means, in a proper manner, and that this negligence was the real cause of the collapse. The defense to the claim for workmen's compensation is to the effect that the plaintiff was not an employee in that he was an independent contractor and to the further effect that Morgan Lindsey, Inc. were engaged in the retail merchandise business which is non-hazardous under the workmen's compensation act.
After trial of the case, the district court rendered judgment in favor of the defendants dismissing plaintiff's suit at his costs. Plaintiff has appealed.
The trial judge has not favored us with written reasons for his judgment but it appears apparent that he must have concluded from the evidence, (a) in so far as the compensation claim is concerned, that the plaintiff was not an employee under the terms of the compensation act but on the contrary was an independent contractor and/or that Morgan Lindsey, Inc. were not engaged in a hazardous occupation under the terms of the workmen's compensation act; (b) that the accident was not caused by any vice or defect in the building or by any negligence on the part of the defendants and/or that the plaintiff was guilty of negligence which caused or contributed to the accident.
The record in this case is voluminous and consists of much repetitious testimony and testimony that is not very pertinent to the issues involved. It does not seem necessary to review this large record in detail because the important facts are pretty well established by the evidence even though there is some slight contradiction in the testimony.
It seems clearly shown that the building in question had been burned or charred some time previously to the decision to make the alteration involved herein. It is shown by the testimony of Mr. Corbin, who is referred to by plaintiff as the defendants' contractor and by defendant Morgan Lindsey as an eminent contractor, that this building was repaired by him subsequent to the fire and that at that time some of the charred timbers were allowed to remain but new timbers with some reinforced iron, were placed where found necessary. Plaintiff's counsel strenuously contends that this is sufficient to show a vice or defect in the building but neither Mr. Corbin nor anyone else has testified that these charred timbers or lumber in any way affected the structure. It appears from that testimony that this charred timber or lumber was merely surplusage which did not strengthen but in no way weakened it. Mr. Corbin further testified that upon request of Mr. Bedgood, the manager of the store, he inspected the storeroom and the proposed work to be done in order to strengthen the second floor support and at that time he concluded that the job was not urgent. He, at the time, was busy with other work but stated at a later date that he could do the job. It appears that the plaintiff, who lived in New Orleans, learned about the proposed job through a relative of his who was employed by Morgan Lindsey and he thereupon applied for the job and was given the job by Mr. Bedgood, the manager. Bedgood testified that an agreement was reached with plaintiff Wells that he would receive the sum of $365 in full payment for the work of replacing the two wooden posts with steel columns and that he, plaintiff, would furnish all labor and tools necessary for this work. Plaintiff denies that he made a fixed fee bid for the work and testified that he agreed to do the work on the basis of time, material and expenses. In any event, plaintiff arrived at Houma on August 6, 1946 accompanied by Mr. Worrell, another carpenter, whom he had employed to assist him. After plaintiff and Worrell had worked but a short time, plaintiff decided that he needed additional labor and he thereupon employed two Negroes, Morrison and Thomas, to assist in the work. At about 11:00 A.M. on August 6, 1946, while the plaintiff and Worrell and the two laborers were engaged in removing the first of the two posts to be replaced and were using a house jack in order to support *Page 285 
the weight as a substitute for the posts being removed, the structure collapsed. It is the defendant's contention that the house jack slipped and failed to afford the proper support. On the other hand, the plaintiff contends that the real cause of the collapse was the vices or defects in the building caused by the fire which had occurred previously, and in support of that contention, he introduced testimony to the effect that the collapse was not instantaneous but took about a minute resulting from cracking here and there in the building and as further shown by the fact that carpenter Worrell and the two laborers had sufficient time to get out before the collapse.
On that important point, Morrison, one of the laborers, testified that when he went in the store he found that the old post had been removed and that in order to support the ceiling, Wells had placed a six by eight with a jack under it and two two by fours ahead of it and finally that the jack "walked" and the collapse then occurred. Witness Thomas, the other laborer, made this statement: "After we brought the post (steel post) in and we laid it down, and I think Mr. Wells he asked Morrison to saw the post. That was the two by six. He asked him to saw that, and after Morrison said he wouldn't saw it then I think he started to saw it himself. And after he started sawing it this post what had the jack under it, it started moving a little bit, and I started getting out the way myself. And I told them this thing is going to fall. So after he said that good then she caved in. That's all I remember."
Worrell's testimony as to how the accident happened is as follows: "We came over on the 5th to put in a couple of steel columns. It was steel pipe is what it was. And on the morning of the 6th we went over and slipped the mirrors off the column and pulled the baseboard from around the bottom of the column or the molding, and pulled up a piece of flooring to see what we had underneath where we would put the jack. We found it was concerte, (concrete) so we put a two by twelve, run it straight with the floor, set the jack on this two by twelve with a six by six in an upright position under the beam, and that is the way we jacked it up. Then we stripped the column off, the outside casing off the column, and we taken it out, and we was ready to put the steel column under to replace it, and there was some popping overhead, and when it popped I run like a hillside rabbit. I didn't wait to see what it was."
This witness testified further that the supporting jack was placed under the beam at about 8:00 o'clock and that the collapse did not occur until 11:00 o'clock. Upon being asked the question: "From your knowledge of your profession, which you have followed for twelve to fifteen years, and your knowledge of the manner in which this operation was conducted, would you say it would have been possible for this jack to slip and thus cause the collapse?" he answered: "If the jack would have slipped, it would have slipped when we first put it under there. The same pressure was bearing on it from the time we put it under there until the time it collapsed. We didn't tighten up any more on the jack. We tightened up to start with. What taking up we did was right at first. There was no point in touching the jack again until we taken it out." This witness was also permitted to express his opinion as to the cause of the accident and stated: "I think it was bad timber in the overhead beam. It had gotten bad and it broke."
Plaintiff testified first with reference to his employment to the effect that he was employed by Mr. Bedgood to replace two wooden columns with two steel columns; that he was to do this work for Morgan Lindsey under the supervision of Mr. Bedgood at $1.75 per hour for himself plus the cost of other carpenters and laborers. With reference to the actual accident, he first tells about removing the column and then "We made preparations to put the steel column in the place where the old column had been, and it was a matter of fifteen or twenty minutes or more, and I heard a terrible crash up above, and that was the time that it looked to me like about the center of the two *Page 286 
columns, you know the distance of the columns how they are situated, looked like it was right about the center. When things happen that fast you don't know, you are thinking about getting out, but I failed to get out." Of course, the sum and substance of his testimony is that he was doing his job under the supervision of Mr. Bedgood and that the cause of the accident was not any negligence on his part or the part of his helpers but was because of the vices and defects in the building.
With reference to plaintiff's tort claim, the preponderance of the evidence is to the effect that he was employed as an expert to do a specific job, to-wit remove two wooden columns and replace them with steel columns; that he had full control of this job and as a matter of fact he himself employed another carpenter, Worrell, and two laborers, Morrison and Thomas for the purpose of doing this work. The preponderance of the evidence shows that the accident was caused by lack of precaution on the part of plaintiff in removing one of the two wooden posts without sufficient protective support of the overhead beam. There is some evidence that the timbers on this structure were defective and even testimony to the effect that termites were present and had attacked the structure. In spite of this evidence it appears that the real proximate cause was the slipping of the house jack because it was improperly placed under the beam, and this was done by the plaintiff. There is no supporting evidence of the allegation that the defendant Morgan Lindsey, Inc. unduly loaded the storeroom with goods and merchandise causing the second story to collapse. It is our conclusion that plaintiff has not established by a preponderance of evidence that the accident was caused by any vice or defect in the building or by any negligence on the part of Morgan Lindsey, Inc. and we therefore feel that his claim in tort against either defendant was properly dismissed.
With reference to his claim under the workmen's compensation act, of course, the defendant Alice Blahut is not concerned. As to the other defendants Morgan Lindsey, Inc., and its insurer, it is shown that the insurer carried workmen's compensation insurance on Morgan Lindsey, Inc. However, this is not evidence that such insurance was necessary or that Morgan Lindsey, Inc. was engaged in a hazardous occupation, or, for that matter, that the plaintiff was an employee of Morgan Lindsey, Inc.
It is our opinion that the defendant Morgan Lindsey, Inc. is correct in both of its contentions; (a) that plaintiff was an independent contractor and (b) that Morgan Lindsey, Inc., as the operator of a retail mercantile store, was not engaged in a hazardous trade, business or occupation within the meaning of the compensation act.
With reference to the first proposition, as brought out hereinabove, the preponderance of the evidence is to the effect that plaintiff sought and obtained a contract to do the alterations desired in the store building and that he thereafter secured his own assistants to do that work and furnished his own equipment therefor, and the materials necessary to do the work, such as the steel posts and lumber.
In the case of Rodgers v. City of Hammond, La. App., 178 So. 732, and Hebert v. Blair, La. App., 142 So. 849 and Allgood v. Loeb, 210 La. 594, 27 So.2d 380, it is shown that three primary factors must be taken into consideration to determine whether or not a person performing services for another is an independent contractor and without the protection of the compensation law, to-wit (1) whether the service is rendered for a specific recompense, (2) for a specified work either as a unit or as a whole and (3) whether the person rendering the service retains control and direction over the means and methods employed by him in accomplishing the work.
In the case at bar, whether we accept the testimony of Mr. Bedgood to the effect that this job was to be done for $365, or the testimony of the plaintiff that it was to be done at the rate of $1.75 per hour for plaintiff plus all costs and expenses of assistants, the fact remains that the work *Page 287 
was contracted for at a specified recompense.
The evidence is clearly to the effect that the work contracted for was to replace two wooden columns with two steel columns so that the second test as to specified work as a unit or a whole is met.
The preponderance of the evidence is to the effect that the plaintiff retained control and direction over the means and methods of performing the work. He employed his own assistants and used his own tools in performing the job. He states that he was acting under the supervision of Mr. Bedgood but there is no evidence to that effect and there is no evidence that Mr. Bedgood, beyond being the manager of a retail store, had any knowledge of the particular work to be done. As a matter of fact, the evidence shows that the job would have been turned over to Mr. Corbin, an experienced contractor, had Mr. Corbin had the time to do it and that the plaintiff was accepted in Corbin's place under the belief that he was a similar expert and could take care of the situation.
It seems clear therefore that all three tests, as set forth in the cases cited, have been met in establishing the fact that plaintiff herein was an independent contractor.
Since plaintiff was an independent contractor, it does not seem material to consider the second point advanced by defendant that the operation of a retail mercantile store is not a hazardous trade, business or occupation within the meaning of the statute. However, plaintiff contends very strongly on that point and if it could possibly be admitted that he is an employee, the contention is material. Plaintiff's contention is that Morgan Lindsey, Inc. does come within the provision because it operated a warehouse and because the store contained electrical equipment including fans which were dangerous. In so far as the warehouse proposition is concerned, the warehouse in question was merely a small storage or stockroom 30 by 40 feet in dimension and used exclusively for the purpose of the retail store. In the case of Caldwell v. George Sproull Co., La. App., 164 So. 651, 653, affirmed by the Supreme Court in 184 La. 951, 168 So. 112, the Court of Appeal for the second Circuit said: "The statute declares to be hazardous the occupation of operating warehouses. Such a business is a distinct and well-defined one. A 'warehouseman' is one 'lawfully engaged in the business of storing goods for profit.' Act No. 53 of 1920. The goods referred to, of course, being goods of third persons for which negotiable receipts are issued. Act No. 221 of 1908. A permit for the operation of such a business has to be obtained from the clerk of the civil district court wherein the business is carried on. Section 1 of Act No. 82 of 1926. Other requirements are prescribed by the statute before a person may legally become a warehouseman. Surely, because a wholesale dealer stores surplus stock bought or manufactured by him, in the basement of his building, as is done by defendant, he does not thereby engage in the occupation of operating a warehouse. Such a room is no more than a storage room. It is in no sense a warehouse. The position of plaintiff here discussed is not tenable."
With reference to the dangerous electrical equipment on which plaintiff relies to show the hazardous nature of defendant's business, the testimony shows that in the store defendant maintained four electric fans and one small key machine operated by a 1/20th horse power motor; that all of these electrical appliances were enclosed; there is no evidence whatsoever that the plaintiff herein could in any manner come in contact with these appliances and we cannot see how, even if plaintiff can be considered an employee, that these appliances should make his employment hazardous. The defendants in their brief cite several cases including the case of Lafleur v. Johnson, La. App., 37 So.2d 869, 872, recently decided by us, wherein we said: "Since the operation of a joint saloon and night club is not named in the act as one of the hazardous trades, businesses, or occupations covered by the act, nor is any form of mercantile business, wholesale or retail, so designated therein, plaintiff would only be entitled to compensation *Page 288 
if the facts showed that in the performance of his duties decedent necessarily came into direct contact with electric motors. This, she has failed to do. We do not want itunderstood, however, that these small enclosed, electric motorsin any particular case would be sufficient to classify anyemployer defendant as engaged in a hazardous and non-hazardousoccupation. Under the facts of the case, the compensation actis inapplicable." (Italics ours).
It is our conclusion that the unfortunate accident involved herein resulted through negligence or lack of skill on the part of the plaintiff, an independent contractor, who contracted to do a specified job, and that therefore, as found by the lower court, he has no standing in court either under our tort statute, Civ. Code, § 2315 et seq., or our workmen's compensation statute.
For these reasons, the judgment appealed from is affirmed.